Rob Schultz for the plaintiff BPP. BPP is a fictitious name used by the business of Dr. Cohn, who's a longtime periodonist in St. Louis County. He has a fax machine. He gets faxes advertising. He doesn't like it. It wastes his time. It wastes people's time. This is a TCPA case. The district court below committed one error, and it was a material error. The district court, in determining whether, and I'll show it to you in a minute, the fax that was received was advertisement, disregarded the FCC regulations on that point, and went along with a case from the Sixth Circuit called Sandusky. I'm going to talk about Sandusky for a second, because in Sandusky, the Sixth Circuit expressly refused to follow 47 CFR 64-1200F, which is the FCC's definition of unsolicited advertising. Now, what's strange is probably nobody in the Sixth Circuit would look at the statute. The TCPA itself has a good definition for unsolicited advertisement. It's essentially identical to the FCC regulation. Mr. Schultz, you may want to stay a little closer to the microphone, because it's all being recorded. I feel like those old Phil Donahue shows when he walked around the crowd. My first argument is, it was error to follow Sandusky, and Sandusky itself is an error, because it makes no sense to refuse to follow a FCC regulation, and the Sandusky court came up with its own definition of advertising, when the FCC definition is essentially identical to that of the statute. The statute controls, and I win, my client wins under the statute. Here's the advertisement at issue. It was faxed to approximately 55,000 doctors. The defendant went through its pharmacy records and found the 55,000 doctors who had prescribed opioids to people 19 and under, and then sent this to them. This is an ad for a new program that CVS has. It applies a three-day limit on certain prescriptions for opioids to younger people, and the doctor is invited to make use of that program, and CVS says in this ad that it's an offering to protect your patients. So this is an inducement to Dr. Cohen and the 55,000 other doctors to make use of this program. Additionally, it's also an inducement to prescribe opioids to these people if you have this protection behind them. So under, I have the statute here, it's the same as the reg. This is an unsolicited advertisement under the TCPA. It's material advertising the commercial quality of any goods or services. Whether this is an ad for opioids or an ad for prescription services, it's a simple case. Yes, at least it survives summary judgment. I mean, I'm supposed to get all the inferences, and summary judgment is not a trial on the paperwork. Now, the Sandusky case talks about having to show some sort of commercial motive arising from the four corners of the advertisement. I would point out that when a commercial company sends an ad inducing people to use a commercial prescription services or to use a prescribed drug, that should be presumed to be for a commercial purpose. That's under Sandusky. My point is Sandusky doesn't even apply and should not be followed. You're being asked to adopt Sandusky for the Eighth Circuit, and Sandusky is directly contrary to the statute. So when summary judgment was granted below, it was granted the district court accepted Sandusky, did not follow the FCC reg. This is an easy decision for this court. I know I'm last, but I'm not least. And I just want to say that I'm asking the court to reverse the district court where it was led into error to accept Sandusky and not follow the FCC reg on this point of whether this is advertising. Any questions? Well, I just have one. If we look at the statute, it talks about the term unsolicited advertisement means, right? Yes, sir. To say commercial availability or quality of any property, that's not going on here. Correct. Or goods, that's not going on here. Well, it could be the prescribed drug, but I understand. I think it's the service. It's the services only. Absolutely. And so the argument essentially that's being advanced is that it is an advertisement because it's talking about that, hey, we have a service that would put a three-day limit on opioids in these naive younger patients, and that is like drug naive rather than. I understand. I think the service is more the pharmacy services. But, yeah, the particular item talked about is sort of like a portion of the pharmacy services provided by CVS, Caremark, and whoever their client is. And what they're saying is, well, all we're really doing is giving you information that this new program exists. Why are they wrong on that? Well, you know, advertisements contain information. Don't we see all those drug advertisements on TV? I mean, I can't even watch a football game without being bombarded with drug advertisements, which also seem to have a long list of side effects. So information does not mean it's not an advertisement. For instance, Judge, if you were looking for a new car and Ford Motor said, hey, we have a new electric Mustang that goes 0 to 60 in three seconds, that's information. It's also advertising. What this information does, it's touting their new program. It's touting their pharmacy benefits. It's touting the use of opioids. I'm not saying it's evil. I'm saying it's advertising. I hope I answered your question, Your Honor. You did. Thank you, sir. Any other questions? Their clients referenced in here are employee health benefit plans, right? I'm not sure. It's not described in there. Most people getting this would think it's from CVS Pharmacy, because most people don't know about pharmacy benefit companies. But, yes, they're talking about, I believe, their clients who are employers who provide pharmacy services to their employees. That's how I read it, but that may not be how a doctor who receives this reads it. How do you read it in a way that is going to cause the recipient to want to be involved in their program or buy the opioids? I'm sort of lost how that's an advertisement. Well, it's certainly advertising a pharmacy program for opioids. And it's certainly saying, oh, I'm sorry, Judge. But it's a limited thing, too. It's basically saying no more than three-day supply for adolescents. You can feel safer prescribing opioids to your young patients because we have a program that will backstop you and make it safer. It's similar to someone saying, buy my car, we have airbags. So you think this knowledge of this three-day limit would induce a physician to use CVS? Yes, sir. And I'll simply point out, if it doesn't do that, then why is it sent to 55,000 doctors? See, I don't read it that way. The way I read it is CVS, which is the benefit manager, and there may be an employer that provides their own health insurance. They may be through a group plan, Blue Cross Blue Shield, whatever. But CVS is the benefit manager for the drugs. And what I see them saying is, you should understand, Mr. Physician or Mr. Parodontist, or Ms. Parodontist, that going forward there's a good chance that the particular insurance company that you're dealing with is going to put a three-day limit. So don't be surprised when they say you've got to justify more than a three-day limit or you've got to just keep re-re. And I don't think the physician, the parodontist, has any choice. They don't join this program. No, but a lot of times when faxes to doctors are considered to be faxes, it's sent to patients. The doctor himself does not buy opioids. His patients would. And this is saying, we're offering more ways to help protect your pediatric and adolescent patients. So it's an offer to the doctor to make use of this program. But see, I don't think the doctor has a choice. That's not how – I mean, it's a little self-serving. And they probably should have left that out. I'm sure if they had to do over, maybe they might have. I mean, it's kind of like beating their own chest a little bit, what great people we are. We're attacking the opioid problem. But as I understand it, the doctor has no choice. What they're telling the doctor is the insurance companies that you're dealing with, where we manage their prescription program, are very likely going to have a three-day limit, and you should be aware of that, Mr. Paradonis. Well, that is one way to read it. But remember in summary judgment, I know, I get the inferences, and maybe that's a fact issue for the fact finder to find. Because summary judgment is not a trial on the paperwork. And while I will concede for you, Judge, that perhaps that is one way to read it, it is not the only way to read it. I think you can also read that as saying, doctor, you can feel safer prescribing opioids, or doctor, you should make use of this program by directing your patients to CVS or find out if CVS is their pharmacy benefits manager. Your way of reading it, Judge, renders this a nullity, which is we're telling you information and it has nothing to do with you and you can't use it, then why are you wasting my time by faxing it to me? Well, maybe not, because doesn't the, I guess it would be the penultimate sentence say, in addition you can request prior authorization for patients whose clinical diagnoses may require a longer day supply for ongoing care. Right. The doctor seems to imply that they're going to have a three-day supply limit unless you do something else. Right. But he's also, the doctor is being at least partially induced to make use of this program however he can, and second, feel safer about prescribing opioids to his patients. My point is, under the FCC reg, and this, oh, that's actually the statute, excuse me. They're the same thing. This is an ad. It's an ad for a commercial business selling goods, selling prescription drugs, either through themselves or their clients, and under these, the statute and the regs, it's an ad. Now, this was determined on summary judgment. Mr. Schultz, your time has been expired for questions. I'm sorry, Judge, and I appreciate the time you've given me. Mr. Leffel? Yes. May it please the Court, Michael Leffel for the appellees, and I'm joined by one of the newer members of the Eighth Circuit Bar, my colleague Andrew Gresick. Your Honors, the notice at issue here was informational. It provided information about new restrictions that were going to be impacting this doctor and other doctors and their patients. There's no dispute here that BPP, the fictitious name for Dr. Cohen, that Dr. Cohen had prescribed opioids for people in these health care plans that were being talked about in the notice. And for that reason, since it was informational and it wasn't offering anything to be sold or purchased by BPP, Dr. Cohen, or any of his patients, they were already enrolled in these health care plans, there was no profit motive. And that's why this case is just like Sandusky, and respectfully appellees believe there's no way to reverse the decision below without creating a direct circuit split, not only with Sandusky, but with several other courts of appeals that have looked at the definition in the TCPA as well as the FCC's regulation. And just to be clear about one thing, well, two things, frankly. Sandusky didn't ignore the FCC. It said we don't need to get there because the statute is unambiguous. But even if we went there, it would only embolden our position. That's what Sandusky said. But the most important thing, and I'm not sure if this is what BPP is intending, but at times they seem to be divorcing or eliminating the word commercial from the statute. And what the Sixth Circuit and the other courts that have looked at this have said is commercial modifies both the availability as well as the quality of the property, goods, and services that are available. And that's why in those other circuits where they have looked at the standard definitions of commercial as well as advertisement and looked at the specific definition in the TCPA, they say there has to be some profit motive, some sale at issue. Here there isn't one. And in fact, none of the cases, plaintiff cites a number of cases that have found some TCPA violation that can survive, or at least an allegation that can survive a motion to dismiss. None of them disagree with Sandusky, and this court shouldn't either. So that's why we say there's a big distinction between this case and a case that BPP says in his statement of issues is one of the most relevant. The Michigan Urgent Care, a district court case that actually looked at a situation where there was maybe not a direct purchase by the doctor who was sent a message, but there was an intended business relationship, a sale that was going to take place that was going to benefit the defendant down the road. And at the motion to dismiss stage, that case involved prescription cards. If you get your patients to use these cards, ultimately the pharmacies would pay money that somehow the defendant would benefit. And the court said, look, at this motion to dismiss stage, it's not clear how that operates, but what is clearly alleged is that they're going to make money down the road off of this. And what it does in Michigan Urgent Care, again, a case he says is very relevant, is go down line by line and say what's different about that case and Sandusky. And all of that is true here as well. Let me just say one thing so there's no confusion about this issue. The notice that he had up here, and it is in the record, is a message from CVS Caremark about what its plan sponsors are adopting. It is not from CVS Pharmacy. It does not say it's from CVS Pharmacy. And the two are separate entities. The Caremark entity that is being sued here provides pharmacy benefit management services. It is not a retail pharmacy. You can't go and buy opioids from them. So, again, just proving the point that there's no ultimate sale message or no profit motive here in sending out this message. Well, the appellant says the notice is confusing, but what it says, starting October 1, 2019, our clients are the opportunity. Yes. And he said that that seems to be implying that Dr. Cohen can opt into this program. What's our client supposed to refer to there? Our client, and good question, our client clearly refers to those plan sponsors. And, look, the TCPA is a very strict statute. You've all seen several cases like this that deal with the TCPA. But it's not a misrepresentation case. And the only evidence in the record is that those clients and the only people who could adopt this edit is what they call it. It's kind of like the formulary in the Sandusky case, but here it was a three-day supply limit. The only entities that can adopt those are the plan sponsors. Now, we had, I believe, 24 paragraphs of undisputed material facts when we submitted our summary judgment brief. Most of them were not refuted. There were five that were nominally refuted, but not with competent admissible evidence. And so I would say, on the undisputed record, those clients are undisputably not Dr. Cohen or BPP, but the plan sponsors. We raised several other issues in the brief, and I'm happy to go into anything, but I would just highlight a couple maybe, I dare say, cleanup items. But first of all, there's nothing in this notice that would suggest that Caremark or any of its plan sponsors were trying to encourage people to write more prescriptions for opioids. It's clearly trying to limit opioids. And there's at least one federal court in the Northern District of Ohio that has recognized that these kinds of limited three-day limit type things is a way to discourage opioid use. Nobody's trying to encourage opioid use. But in any event, Caremark isn't selling opioids anyway. The second thing is there's some suggestion that there's been a concession that this was marketing because somebody in the MARCOM department at Caremark worked on it. That stands for Marketing and Communication. The only undisputed testimony in the record is that that department gets involved whenever there's outward-facing things, not just with advertising. So I'm happy to talk about any other issues that you have, but in sum, the key issue here is whether there's a commercial relationship. I guess I would add, since I have a moment, one of the other reasons that you know to connect commercial and look for the profit motive for both availability and quality was actually in the Facebook, I believe it's pronounced, do-good decision from the Supreme Court that BPP cites in its reply brief. In that case, it wasn't looking at this language, but it was looking at the TCPA, and it applied what is called commonly the pre-series or post-series qualifier. And in a unanimous decision, but eight justices joining the majority, they said when you've got one word at the front, an adverb or an adjective, it will define those following nouns. It's a rule of grammar. I think you can look to it if you're looking for extra assistance here. I don't think you need to. I do think it's clear from the cases that we've cited in the briefing that all of these cases from the other courts of appeals that have addressed this issue have read it the same way that Sandusky reads it. There's nothing further, Your Honor? Hearing nothing. Thank you. Thank you. Mr. Schultz, I was just going to tell you, I'll give you one minute. Apparently there's no one sitting on my side of the room. This is like a wedding. A couple points. One, Sandusky should not be adopted by this court. I'm aware of Sandusky being cited only in the Fourth Circuit, and then it didn't seem to follow it. It was a case where someone was giving away free PDRs, physician desk references, and while the case was cited in the Fourth Circuit, it doesn't look like the Fourth Circuit followed it. Number two, to follow Sandusky is to violate the statute and to violate the FCC reg. Finally, if you look at these TCPA cases, half of them are drug cases where people are sending information about drugs to doctors to get them to prescribe them. This is one of those. And in this, we have a letter written to doctors telling them, here's a new program that will help your patients. That's an invitation to try to use it. What doctor would not use the program they're talking about? It's commercial. It's drugs. It's an ad under the TCPA. Thank you. I'm under a minute. Well done. And I agree. Thank you very much for giving me that minute. You're welcome. Counsel, we appreciate both of your arguments today and the cases submitted, and we'll issue an opinion in due course.